[No. 30224. Department One. July 31, 1947.]

CLARA ESTHER BRESHEARS, *Respondent*, v. UNITED BENEFIT LIFE INSURANCE COMPANY, *Appellant*.[1]

*D. H. Bonsted,* for appellant.

*George C. Twohy,* for respondent.

ABEL, J.—Plaintiff was the beneficiary of a life insurance policy issued by defendant upon the life of her husband, Bernie B. Breshears. On June 16, 1945, the insured, being

[1]Reported in 183 P. (2d) 1015.

then a man forty-three years of age, signed a written application to the defendant company for a policy of life insurance in the sum of twenty-five hundred dollars. The policy was written without medical examination and in consideration of the statements made in the application. Among other things, the insurance policy contained the following provisions:

"THE CONSIDERATION FOR THIS POLICY is the application therefor, copy of which is attached hereto and made a part hereof, . . .

"This policy and the application therefor, taken together, constitute the entire contract between the parties hereto. . . . All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties and no such statement made by the Insured shall void this policy unless it is contained in the written application therefor, copy of which is attached hereto."

The application contained the following agreement, which the insured answered in the affirmative:

"13. Do you hereby apply to the United Benefit Life Insurance Company for a policy to be issued solely and entirely in reliance upon the written answers to the foregoing questions, and do you agree that the Company is not bound by any statement made by or to any agent unless written herein."

The policy was mailed from Portland by the company on June 28, 1945, and was delivered to the home of the insured within a few days thereafter.

The insured was a strong, robust, steady, farm laborer. His reputation for truth and veracity, in the community in which he resided, was good; this being testified to by a number of witnesses, including David H. Anderson, the agent of the company that wrote the policy. The insured had been a steady worker and, according to several of the witnesses, had never missed a day's work until his last sickness. His wife testified that he had never been seriously ill since their marriage; that they had grown children, and that she could not recall any days that her husband had been away from his work because of illness until the sickness which caused his death in October, 1945. A number of

witnesses testified concerning the insured's good health at the time of making the application for the insurance policy, and for a number of years prior thereto.

Apparently, the first time the insured had consulted a physician was on February 9, 1945, a little over four months prior to making the application for insurance. At that time, the insured consulted Dr. Paul F. Shirey, who testified, by deposition, that he was consulted by the insured on February 9, 1945; that the insured's complaint was a pain in the chest; that he had had a cold for some time, and that this pain disabled him and he was unable to work because of it. The witness testified that he gave the insured a complete physical examination, but that there was no laboratory work done at that time, and there was no fluoroscopic examination or X rays; that he took the insured's blood pressure and found it to be 240 over 120, which is extremely high. The witness further testified:

"Q. After you had taken his blood pressure, what did you say to him concerning his blood pressure, or anything else about his condition or that examination? A. Mr. Breshears consulted me about his respiratory infection, and naturally the conversation was more limited to that—to his first complaint. We undoubtedly discussed our other findings, and as I do remember at that particular time, we needed more laboratory work to determine how ill he was, and Mr. Breshears was unable to pass the urine sample in the office, which in these cases is important. We went ahead with the treatment of his complaint—I don't recall exactly what the treatment was at that time. However, we didn't treat his blood pressure because we hadn't completed the necessary work relative to that finding. Q. Did you tell him something, or make some comment about his blood pressure? A. With a blood pressure as high as that was, I undoubtedly made some remark about it, and I am quite sure that I asked him to return so I could check on the finding. Q. State as near as you can recall, what you did tell him at that time—I am now referring to February 9th—what you did in fact tell him about his blood pressure. A. I can't remember our exact conversation, but the fact that he did return some time later with no other complaint than to have an examination relative to this finding, I think that I can state that I told him that his blood pressure was too high for his own good—that he wouldn't be able to continue in his present occupa-

tion if his blood pressure remained high. Q. Did you say anything to him about—that his blood pressure ought to be watched? A. I must have—the fact that he came back later with no complaint— Mr. Twohy: This is off the record, but that seems to me a leading question—of course— Mr. Bonsted: I don't think so, George. Mr. Twohy: Well, I can object to it later. A. (continuing) I might state here, too, that lots of times, in a respiratory infection you find an acute nephritis, which would explain these findings and which would later subside. I make that statement simply because we didn't—at that time—treat his blood pressure. In other words, we weren't through with that yet. Q. Did you on that occasion tell him what the blood pressure reading was? A. I can't say that I did. Q. What is your best recollection about that? A. Well, ordinarily I don't tell the patient exactly what their blood pressure is, unless they specifically ask. I do make a habit of telling them that it is normal, high or low."

The witness then testified that the insured returned to his office on February 12, 1945, with the same complaint. On that occasion, he was treated with a narcotic (codeine) for the relief of pain, which he was directed to take as often as necessary to relieve his discomfort. The doctor testified that his records showed that the insured had a friction rub, and that he could tell from looking at Mr. Breshears that he was in pain and was uncomfortable. The witness then testified as follows:

"Q. My memorandum on that occasion indicates that you told me that after you had taken Mr. Breshears' blood pressure, you told him that it was too high for his own good and ought to be watched. A. Yes, I remember. Q. Do you now say that you did, in fact, tell him that, or that in substance? A. I'd say that we discussed the matter—as I said before, I doubt very much whether I told him exactly what it was, but ordinarily a blood pressure that high—you don't like to just let run around the streets—you like to keep some check on them, and in order to impress that fact on his mind, I would have to make some remark relative to it—a man with a blood pressure that high is in danger all the time. Q. Well, did you apprise him by some statement that you made to him, of that fact? A. I'd say yes, and the fact that he came back later for a check-up on the thing. Q. In your opinion, when he left your office after your examina-

tion on February 9th, was he—had you said enough to him to impress him with the idea of the seriousness of his blood pressure? A. Mr. Breshears didn't impress me as the type of person who would worry a great deal about anything— I can't answer that—that is, I can't say that we had any lengthy discussion about the thing."

On cross-examination, the witness testified as follows:

"Q. Now, as I understand, when Mr. Breshears was first treated by you on February the 9th, his complaint was that he had a cold in his chest. A. That's right. He had a cold and developed a pain in his chest, in conjunction with it. Q. That was also true on February 12th? It's simply the matter—he really had a chest cold, with a little touch of pleurisy? A. That's right. . . .

"Q. Now, Doctor, did you not state to me, as attorney for Mrs. Breshears, and did you not also state to Mr. Bonsted as attorney for the insurance company, that you were not aware of the graveness of Mr. Breshear's illness until July 24th, 1945? MR. BONSTED: (interposing) I want to object here. MR. TWOHY: You can object later. MR. BONSTED: That's all right then. A. That's right. Q. And from your experience as a practicing physician of many years' standing, what is your opinion as to whether Mr. Breshears knew that he was very gravely ill on February 9th or February 12th? A. I believe that Mr. Breshears was mainly concerned with his acute condition—as I stated before, I don't think he was a person who concerned himself too much with his health, and as long as he felt good, he thought he was good. Q. And then, these two times that you examined him, namely, on February 9th and 12th, 1945, he was merely complaining of this chest cold at the time? A. That's right. Q. I believe that you stated further to me that Mr. Breshears didn't know that he had a serious ailment until July 24th, that being the date that you took the first urinalysis. MR. BONSTED: I want to save an objection for that. A. That's right. That was the first time I saw Mr. Breshears after his acute ailment had subsided."

David H. Anderson testified that he was an agent for the defendant company, and that he wrote the application for insurance involved in this case. He testified that, on the day that the application was written, he had gone to the insured's home and had lunch or dinner with them. He stated that he thought the insured was a good prospect to

sell life insurance to, and that, at the time he took the application, the insured appeared to be in good health. He stated that the application was in his own handwriting, and then testified as follows regarding the questions in the application:

"Q. Did you ask him all of these questions? A. I don't pretend to use every word that is written there. I use my own language, but I get the meaning across; they understand what it is. Q. Then, you don't want the jury to understand that you read each of these questions to him, do you? A. I do not. Q. No. You just generally asked him some questions about his health, did you? A. No, I asked him him specific questions, but I mean I didn't use the language that might be written, printed out, there. I used my own words, but I got the meaning across."

The application contained, among other things, the following questions, all of which were answered in the negative:

(1) "10. (a) Have you ever had any of the following diseases? Answer each. Tuberculosis or any respiratory disease *No* . . ."

(2) "(c) Has any medical examiner or physician, formally or informally expressed unfavorable opinion as to your insurability or health? *No*."

(3) "11. Name below all causes for which you have consulted a physician in the last ten years: *None*."

The following question was answered in the affirmative:

(4) "(f) Are you now in good health? *Yes*."

The insured had a tooth pulled during the latter part of September or first part of October, 1945, and, a few days later, developed an acute phase of chronic nephritis from which he died, October 17, 1945.

Defendant refused to pay the insurance and tendered the paid premiums to plaintiff.

It is quite apparent that the answers to the above-mentioned questions were false; however, the trial court submitted the case to the jury, under appropriate instructions, for them to determine whether those answers were made with the intent to deceive. The jury found in favor of

plaintiff, and defendant has appealed, making eight assignments of error.

▆ The last assignment of error has to do with the refusal of the trial court to admit a letter in evidence. This assignment is not seriously argued, and, since the letter was a self-serving statement by an officer of the insurance company to show the reasons why the death claim was denied, there is no question but that the trial court was correct in refusing to admit the letter.

The remaining assignments of error involve the question of whether or not, under the facts in this case, it was a question for the jury to decide whether the insured had an intent to deceive when he falsely answered the questions heretofore referred to.

Rem. Rev. Stat., § 7078 [P.P.C. § 645-11], provides as follows:

"No oral or written misrepresentation or warranty made in the negotiation of a contract or policy of insurance, by the assured or in his behalf, shall be deemed material or defeat or avoid the policy or prevent it attaching, unless such misrepresentation or warranty is made with the intent to deceive. If any breach of a warranty or condition in any contract or policy of insurance shall occur prior to a loss under such policy, such breach shall not avoid the policy nor avail the insurer to avoid liability, unless such breach shall exist at the time of such loss under such contract or policy."

This court has recently handed down a decision in a case very similar to the one at bar, *Kay v. Occidental Life Ins. Co., ante* p. 300, 183 P. (2d) 181. In that case, there was a lapse of several years between the application for insurance and the consultations with doctors which were not disclosed in the application. This court emphasized the following points as evidence of good faith by the applicant: First, he was not seeking insurance; second, he disclosed his rejection a year before by another insurance company; third, he did not take the type of policy that paid the most benefits, but he took instead a twenty-year-endowment policy; and fourth, he did not accept the policy when it was first offered but delayed such acceptance for two weeks.

However, in that case, the insured made his application for insurance in April, 1944, and, by false answers, he failed to disclose that he had a duodenal ulcer in 1937; that he had consulted three physicians in connection with the treatment of that ulcer; that he had undergone X-ray examinations on two occasions, and, on at least one occasion, a fluoroscopic examination. On the other hand, the insured had been advised, in 1938, that he was cured. In that case, we stated:

"Cases construing our statute relied upon by the respondent are readily distinguishable. In every case involving life or disability insurance in which this court held that the policy could be avoided or canceled by reason of misrepresentations, the applicant had concealed the existence of a disease from which he was suffering at the time he signed the application, or for which he was then receiving treatment or had received treatment within the preceding month."

In the *Kay* case, there is an analysis of all of the important cases from this state touching upon the question involved. Following a discussion of the *Houston* case, *infra,* we stated:

"While the brief and oral argument of respondent might be quite persuasive were we sitting as jurors, we feel that it should be directed to a jury, because, when we consider, with all the other circumstances in this case, that Mr. Kay was advised by two doctors some five or six years before he signed the application here in question that his ulcer had completely healed, we cannot hold that reasonable minds could not differ on the question of whether his answers were made with the intention of deceiving the insurance company."

The case of *Houston v. New York Life Ins. Co.,* 166 Wash. 611, 8 P. (2d) 434, involved the same question as that in the case at bar, and we stated:

"It was not within the contemplation of the parties that Houston should disclose in his answer each and every time he consulted a physician. Temporary disorders or minor ailments not impairing one's health, or not tending to shorten life, or not rendering one more susceptible to disease, would not deter the insurer from accepting the application for insurance. At most, it is a question of fact."

The following rule was then laid down:

"It cannot be held, as a matter of law, that, though the answers of Houston were untrue and the applicant knew them to be untrue, he intended to deceive the appellant when making such untrue representations. Under our statute, whether the misrepresentation was material and also whether it was made with intent to deceive, were questions for the jury. Those questions, under proper instructions, were by the jury resolved in favor of the respondent."

In the case at bar, the deceased had been a strong, healthy, vigorous man; he had worked continuously, never taking a day off because of illness; he had never gone to a doctor except on the two occasions in February, a little more than four months prior to making the application, and then because of a severe cold and a pain in his chest. The doctor found a condition of very high blood pressure and had the insured come back, but the doctor's testimony does not indicate that the insured was impressed with the seriousness of his blood pressure. Although there is testimony that the insured did not take any time off, there is also testimony that he did not work for a few days. The insured did not again consult a physician until after the policy was written. There is no testimony that he sought the insurance, but the evidence is reasonably interpreted to the contrary because the insurance agent came to the insured's home and consulted him during a meal. The insured looked like a good insurance risk to the agent, and, in fact, the insurance agent did not specifically ask all of the questions called for in the application for insurance. Apparently in a hurry to get the application signed, he merely asked enough questions to "get the meaning across."

Under the facts in this case, it was a question for the jury to determine whether or not the answers given by the insured were made with an intent to deceive.

The judgment is affirmed.

MALLERY, C. J., MILLARD, SIMPSON, and HILL, JJ., concur.